UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

| | |
|---|---|
| UNITED STATES OF AMERICA | **REPORT**<br>**and** |
| v. | **RECOMMENDATION** |
| CHIRAN J. KANTIPULY, | 06-CR-065E(F) |
| Defendant. | |

_____

APPEARANCES:         CHIRAN J. KANTIPULY, *Pro Se*
Niagara County Jail
P.O. Box 496
Lockport, NY 14095

TERRANCE P. FLYNN
UNITED STATES ATTORNEY
Attorney for the Government
TRINI E. ROSS
Assistant United States Attorney, of Counsel
Federal Centre
138 Delaware Avenue
Buffalo, New York 14202

## JURISDICTION

This case was referred to the undersigned by Honorable John T. Elfvin on March 24, 2006 for all pretrial matters including report and recommendation on dispositive motions.  The matter is presently before the court on Defendant's motion to suppress evidence (Docket Item No. 31), filed May 26, 2006.[1]

## BACKGROUND

Defendant Chiran J. Kantipuly ("Defendant" or "Kantipuly") was charged in a

_____

[1] Defendant's motion (Doc. No. 31) also contains requests for nondispositive relief, which are addressed in a separate Decision and Order filed with this Report and Recommendation.

criminal complaint ("the Complaint") (Doc. No. 1), dated October 12, 2005, with violating 18 U.S.C. §§ 371, 1341 and 1343 by conspiring to commit offenses against or to defraud the United States through mail fraud and wire fraud, based on acts allegedly occurring between January 1999 and August 2003 in which Defendant devised a scheme to obtain money from Niagara Mohawk Power Company ("Niagara Mohawk") through false pretenses.  Attached to the Complaint is the Affidavit of Federal Bureau of Investigations ("FBI") Special Agent Francis J. Carden, III ("Agent Carden") in Support of Criminal Complaint ("Agent Carden Affidavit').  On October 12, 2005, the undersigned issued a warrant for Defendant's arrest for conspiring to commit mail fraud ("the arrest warrant") (Doc. No. 4).  On February 16, 2006, a 128-count indictment ("the Indictment") (Doc. No. 15 was returned, charging Defendant with one count of conspiring to defraud the United States in violation of 18 U.S.C. § 371 (Count 1), 50 counts of mail fraud in violation of 18 U.S.C. § 1341 (Counts 2 through 51), and 77 counts of wire fraud in violation of 18 U.S.C. § 1343 (Counts 42 through 178).

On May 26, 2006, Defendant filed his Pre-Trial Omnibus Motion (Doc. No. 31), seeking both dispositive and non-dispositive relief ("Defendant's Motion").[2]  In particular, Defendant seeks to suppress, as obtained in violation of Defendant's rights under the Fourth, Fifth and Sixth Amendment, statements made by co-conspirator Frank J. Grabowski ("Grabowski"),[3] evidence obtained pursuant to the stop and search of

---

[2] According to a Docket "Remark" dated May 26, 2006, Defendant's Motion was originally inadvertently electronically filed in the wrong proceeding and, on July 20, 2006, Defendant's Motion was scanned and docketed in the correct proceeding.

[3] On September 2, 2005, Grabowski pleaded guilty to one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 371 and agreed to cooperate with the Government by providing complete and truthful information regarding Grabowski's knowledge of any criminal activity undertaken by

Defendant's vehicle at the Rainbow Bridge point of entry to the United States from Canada, and statements made by Defendant.  Defendant's Motion is supported by the attached Affirmation of Charles J. Marchese, Esq. ("Marchese Affirmation").[4]  On June 16, 2006, the Government filed its Response to Defendant's Notice of Motion and Government's Demand for Discovery and Inspection ("Government's Response")(Doc. No. 25).  Oral argument was conducted on August 24, 2006.  On September 1, 2006, the Government filed the Supplemental Affidavit of Assistant United States Attorney Trini E. Ross (Doc. No. 37) ("Supplemental Government Response").


## FACTS [5]

Defendant, a naturalized United States citizen born in India, has been issued passports by both the United States and Canada.  On October 14, 2005, United States Customs and Border Protection ("CBP") Officer Dana F. Pelletier ("Pelletier") was assigned to Primary Inspection duty at Lane 7 of the Rainbow Bridge Port of Entry ("Rainbow Bridge") in Niagara Falls, New York.[6]  At approximately 10:30 A.M. on

---

Grabowski or others involving any scheme to defraud Niagara Mohawk, in exchange for the Government's agreement not to prosecute Grabowski as to any such scheme.  *See* Plea Agreement attached as Exh. A to Complaint.

[4] Mr. Marchese, whom Defendant retained, was terminated by Defendant as Defendant's attorney on June 13, 2006.

[5] Taken from the pleadings and papers filed in this action.

[6] Although Defendant states in papers submitted in support of the motion that he was arrested "while attempting to enter the United States at the Peace Bridge Point of Entry," Marchese Affirmation § 25, the record establishes that Defendant was arrested at the Rainbow Bridge.  See Statements of Officers Pelletier and Gray, and Narrative Summary of Arrest, attached respectively as Exhs. A, B and D to Government's Supplemental Response.  As such, the court construes Defendant's reference to the Peace Bridge as an inadvertent error.  Whether Defendant's arrest occurred at the Peace Bridge or the Rainbow Bridge is irrelevant to the resolution of the instant motion.

October 14, 2005, Defendant was detained at the Rainbow Bridge when Pelletier identified Defendant as the subject of an outstanding arrest warrant issued by the undersigned on October 12, 2005 based on mail and wire fraud.  Specifically, when Defendant, in attempting to enter, from Canada, into the United States through Lane 7 of the Rainbow Bridge, submitted to primary inspection, Pelletier recognized Defendant's name from his passport as a name on the lookout sheet placed in Pelletier's booth that day.  Officer Pelletier observed that although Defendant's license plate did not match the plate number listed on the lookout sheet, the date of birth and name on Defendant's United States passport were the same as those on the lookout sheet.

In response to questioning by Pelletier, Defendant responded that he lived in Canada and was traveling to Tonawanda to check his mailbox, and denied bringing anything into the country.  Pelletier asked Defendant to turn off the vehicle and hand her the keys so Pelletier could check the vehicle's trunk and Defendant complied with the request.  While walking around the car, Pelletier requested "the enforcement team" escort Defendant from Lane 7 to the secondary inspection area.   When CBP Officers Gray ("Gray") and McCarthy ("McCarthy") responded to the radio call, Pelletier showed them the lookout notice.  Gray and McCarthy then asked Defendant to exit the vehicle and escorted Defendant to the trunk area where Gray performed a patdown search of Defendant for weapons.  At the request of CBP Supervisor Febo, Pelletier drove Defendant's vehicle from the primary inspection area and parked it in the enforcement garage.  Pelletier then took Defendant's passport inside to the Customs radio console, and left it with the console officers.

4

Upon identifying Defendant as the subject of an outstanding federal arrest warrant for conspiracy to commit mail fraud, Officers Gray and McCarthy escorted Defendant from the primary inspection area to a detention room in the secondary inspection area where Gray conducted another pat-down search of Defendant.  During the second pat-down search, Gray felt an object in Defendant's left front pants pocket, stopped the search and inquired of Defendant how much currency Defendant was carrying.  Defendant responded he had "$1000 Canadian and US combined," but denied carrying currency for anyone else, or possession of any cashier's checks, traveler's checks, or endorsed checks.  Statement of Officer Gray, Supplemental Government Response Exh. B.  Gray inquired as to Defendant's travel plans, to which Defendant explained he had rented the vehicle and was traveling to the United States to see his attorney about some legal matters in which Defendant was involved.  The pat-down search revealed no contraband or weapons.  Upon determining that Defendant was the subject of a federal arrest warrant, the CBP officers ceased questioning Defendant, and called FBI Agent Carden to the Rainbow Bridge who, upon arriving at the Rainbow Bridge, arrested Defendant pursuant to the arrest warrant and  read Defendant his *Miranda* warning, following which Defendant gave no indication he wished to consult with an attorney.

Officer Gray participated in the search of Defendant's vehicle which also failed to reveal any contraband or weapons.  Gray removed a briefcase discovered on the vehicle's front seat, presented the briefcase to Defendant and requested Defendant open it.  Defendant complied with the request, and a search of its contents revealed only documents but no weapons.  Among the documents seized from Defendant's

5

briefcase were records pertaining to various bank accounts.  The documents were turned over to the FBI, Internal Revenue Service ("IRS") and Environmental Protection Agency ("EPA"), and were subsequently inventoried by the FBI for evidence.

On February 16, 2006, Defendant was charged in an indictment with conspiring with Grabowski to commit a violation of 18 U.S.C. § 371 ("Count 1"), 50 counts of mail fraud ("Counts 2-51") in violation of 18 U.S.C. § 1341, and 77 counts of wire fraud ("Counts 52-128") in violation of 18 U.S.C. § 1343.  Grabowski is named in the Indictment as a co-conspirator, but not as a defendant.

In particular, the Indictment alleges Defendant was the sole owner of Kanti Technologies ("Kanti"), a laboratory with two locations in Amherst, New York and one in Tonawanda, New York that performed chemical analysis of soil and oil samples.  Kanti contracted with Niagara Mohawk, a utility service company, to perform laboratory analysis of samples provided to Kanti by Niagara Mohawk.  Such services included soil and oil analyses, biomight[7] sales, site inspections, report preparation, supply or equipment rental or purchase, lab packing, waste profiling, and grid development and testing.  In 1995, co-conspirator Grabowski, a Niagara Mohawk employee from 1973 through 2003, was assigned to process and approve invoices submitted to Niagara Mohawk by Kanti and which were, beginning in 1999, prepared by Defendant.[8]  The Indictment charges that Defendant occasionally submitted invoices to Niagara Mohawk for work that was not performed and products not delivered.

---

[7] A product sold by Kanti and used as a cleaner or degreaser to clean up oil, grease and tar spilled on hard surfaces.  Indictment ¶¶ 7-8.

[8] Previously, such invoices were prepared by a Kanti office employee who is not a defendant in this case.  Indictment ¶ 18.

According to the Indictment, Grabowski and Defendant conversed about projects in which Niagara Mohawk participated and for which Defendant could bill Niagara Mohawk despite the fact that Kanti did not work on the project.  The Indictment charges Defendant with submitting fraudulent invoices to Niagara Mohawk, either by giving the invoices directly to, or mailing them to Grabowski, whereupon Grabowski would authorize payment to Kanti on Niagara Mohawk's behalf.  The Indictment further alleges Defendant paid Grabowski for informing Defendant for which projects to submit invoices for work not performed by Kanti.   The alleged conspiracy between Defendant and Grabowski commenced in 1999 and continued until September 2003.

In September 2005, Grabowski admitted to law enforcement that he conspired with Defendant to defraud Niagara Mohawk and identified false invoices he accepted from Defendant to secure payments from Niagara Mohawk.  On September 2, 2005, Grabowski pleaded guilty to one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 371 and agreed to cooperate with the Government by providing complete and truthful information regarding Grabowski's knowledge of any criminal activity undertaken by Grabowski or others involving any scheme to defraud Niagara Mohawk, in exchange for the Government's agreement not to prosecute Grabowski as to any such scheme.  Plea Agreement, Complaint Exh. A.

## DISCUSSION

**1.     Suppression of Evidence**

Defendant seeks to suppress Grabowski from testifying at trial, evidence seized from Defendant at the border, and Defendant's own statements made to federal agents

while detained at the border on October 14, 2005.  Alternatively, Defendant requests the

Grabowski be sentenced prior to testifying at Defendant's trial and that the court hold a

suppression hearing to determine whether any such evidence was obtained in violation

of Defendant's Fourth, Fifth and Sixth Amendment rights.


### A.    Co-Conspirator Grabowski's Testimony

Defendant seeks to suppress co-conspirator Grabowski from testifying at a trial

against Defendant, in accordance with the Plea Agreement, arguing that because the

Plea Agreement requires that Grabowski testify before Grabowski is sentenced, such

testimony "will be inherently untrustworthy."  Marchese Affirmation ¶¶ 14-17.  Defendant

therefore requests an order directing the Government to refrain from calling Grabowski

to testify at Defendant's trial until after Grabowski has been sentenced on the wire fraud

charge to which Grabowski has pleaded guilty.  *Id*. ¶ 18.  The Government argues in

opposition that an interested witness's testimony is not *per se* inadmissible as credibility

determinations are for the jury which can always be instructed of the possible "suspect"

nature of Grabowski's testimony.  Government's response at 12-13.  The Government

further argues that sentencing Grabowski prior to his testifying against Defendant will

deprive Grabowski of one of the benefits for which Grabowski bargained in the Plea

Agreement, including Grabowski's ability to earn a reduced sentence.  *Id*. at 13.

The Second Circuit has observed that the testimony of a witness who, like

Grabowski, has entered into a plea agreement and is awaiting sentencing "may be

suspect and should therefore be scrutinized and weighed with care."  *United States v.*

*Gleason*, 616 F.2d 2, 15 (2d Cir. 1979) (citing cases), *cert. denied,* 444 U.S. 1082 (2d

Cir. 1980).  However, "[c]onfidence in our jury system leads us to leave credibility solely to the jury which, as the conscience of the community, is expected to act with sound judgment."  *Id*.  The testimony of a cooperating witness thus is not *per se* inadmissible but, rather, may warrant an instruction to the jury regarding the nature of the testimony. *Id*.

Provided the trial court identifies a cooperating witness's possible motivations for the jury's consideration, a cautionary instruction to the jury regarding the cooperating witness's testimony is sufficient to present the defendant's position as to the possible suspect nature of such testimony.  *See United States v. Vaughn*, 430 F.3d 518, 521-24 (2d Cir. 2005).  Specifically,

> Where the court points out that testimony of certain types of witnesses may be suspect and should therefore be scrutinized and weighed with care, such as that of accomplices or coconspirators, . . . those who have made plea bargains or are awaiting sentence, . . . those who have been granted immunity, . . . and defendants, . . . it must also direct the jury's attention to the fact that it may well find these witnesses to be truthful, in whole or in part.  In short, the court should not emphasize the suspect nature of the testimony of certain witnesses without pointing out that they may be believed.

*Gleason, supra*, at 15 (internal citations omitted) (underlining added).

As such, in the instant case, Defendant's contention that Grabowski's desire for a more lenient sentence may motivate him to give false testimony before a jury in Defendant's trial can be mitigated by a cautionary jury instruction.  Defendant gives no reason to suppose the trial judge could not, upon request, do so.

Furthermore, in the instant case, because the Plea Agreement calls for the Government to move at Grabowski's sentencing for a downward departure from the Sentencing Guidelines, pursuant to § 5K1.1 of the Sentencing Guidelines, based on a

determination that Grabowski "has provided substantial assistance in the investigation

or prosecution of other persons who have committed offenses," Plea Agreement ¶ 28,

an order requiring Grabowski be sentenced prior to testifying against Defendant at trial

would deprive Grabowski of the opportunity for a reduced sentence the wire fraud count

to which Grabowski pleaded guilty and may also frustrate the Government's ability to

obtain Grabowski's continued assistance in this matter.  *See United States v. White*, 71

F.3d 920, 924 (D.C.Cir. 1995) (observing that "the government could rationally conclude

that the premature filing of a substantial assistance motion might remove the very

incentive driving the defendant's cooperation in the first instance, thereby frustrating the

government's ability to obtain the remaining assistance it might need for a successful

prosecution.").  As such, Defendant has no standing to interfere with Grabowski's

decision to plead guilty or the timing of Grabowski's sentencing after testifying against

Defendant.  Defendant cites no legal authority to establish Defendant's standing to

demand Grabowski be sentenced prior to his anticipated testimony against Defendant.

Because Defendant's concerns regarding the alleged suspect nature of

Grabowski's testimony can be allayed by a proper jury instruction, and as sentencing

Grabowski prior to Defendant's trial could deny Grabowski the benefit of the

Government making a § 5K1.1 motion seeking a downward departure from the

sentencing guidelines, for which the Plea Agreement provides as well as frustrate the

Government's ability to obtain Grabowski's complete cooperation in this matter, and

Defendant has no standing to demand Grabowski's sentencing precede Defendant's

trial, Defendant's request to suppress alleged co-conspirator Grabowski's testimony at

trial or, alternatively, to have Grabowski sentenced prior to giving such testimony,

should be DENIED.

**B.     Evidence Seized at the Border**

Defendant contends that evidence seized at the Rainbow Bridge should be suppressed because Defendant did not consent to the warrantless search of his vehicle and briefcase in which he had a reasonable expectation of privacy.  Marchese Affirmation ¶¶ 25-28.  Defendant thus argues both the stop of his vehicle and the resulting search of his vehicle and briefcase were in violation of Defendant's Fourth Amendment rights.  *Id*. ¶ 28.  Alternatively, Defendant requests the court conduct a suppression hearing to determine whether there was sufficient reasonable suspicion justifying the warrantless search of Defendant's vehicle and briefcase.  *Id.*, ¶ 28.

In opposition, the Government asserts that the search of Defendant's vehicle and briefcase was a routine border search for which no reasonable suspicion, probable cause or warrant is required.  Government's Response at 15.  The Government maintains that by attempting to enter the United States, even as a citizen, Defendant consented to the routine border search.  *Id*. at 15-16.  Alternatively, the Government opposes Defendant's request for a suppression hearing on the basis that Defendant has failed to articulate the requisite sufficiently definite, detailed and non-conjectural factual basis to require such hearing.  *Id*. at 16.

"The Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border."  *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004).  As such, "[r]outine searches of the persons and effects of [border] entrants are not subject to any requirement of reasonable suspicion, probable

11

cause, or warrant . . .."  *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985).  Rather, "'searches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border,'" *Flores-Montano*, *supra*, at 152-53 (quoting *United States v. Ramsey,* 431 U.S. 606, 616 (1977)), and are subject to less stringent standards than those conducted after persons or things have entered the United States.  *United States v. Jerome - Oboh*, 883 F. Supp. 917, 921 (W.D.N. Y. 1995).  This general proposition applies to both United States citizens and aliens seeking entry into the United States.  *See United States v. Sanders*, 663 F.2d 1, 2-3 (2d Cir. 1981) (observing in the context of a challenge by defendant, a United States citizen, of a search at the border of the defendant's artificial limb in which cocaine was found, that "[b]order searches are, and always have been, *sui generis*.  Neither warrant nor probable cause is essential for such a search, which is presumed reasonable merely by virtue of the person's or  thing's entry into our country from the outside," and although "more extensive invasions of a person's bodily privacy" requires "great justification," no such justification was required for the removal of an artificial limb for inspection at the border).

"[S]topping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border."  *United States v. Ramsey,* 431 U.S. 606, 616 (1977).   "Routine searches of the persons and effects of [border] entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant . . .."  *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985).

A person, including a citizen like Defendant, upon presenting to an established border checkpoint for entry into the United States, is deemed to have waived any objection to a routine search of his person and property. *United States v. Charleus*, 871 F. 2d 265, 268 (2d Cir. 1989)*; United States v. Ogberaha,* 771 F. 2d 655, 657 (F.2d Cir. 1985), *cert. denied*, 474 U.S. 1103 (1986); *United States v. Nieves*, 609 F. 2d 642, 645 (2d Cir. 1979), *cert. denied*, 444 U.S. 1085 (1980).  Such property has been defined as including outer clothing, and the contents of purses, wallets or pockets.  *United States v. Grote*, 702 F. 2d 49, 51 (2d Cir. 1983).  The search of the interior of the entrant's car is also part of a routine border search procedure.  *United States v. Carreon*, 872 F. 2d 1436, 1442 (10th Cir. 1987) (inspection of vehicle, pat-down of passenger and detention of defendant held to be a reasonable border search procedure).

Here, because Defendant attempted to enter the United States from Canada by car at a border checkpoint, he was properly subjected to "a routine search of his belongings and effects."  *Jerome-Oboh, supra*, at 922 (citing *United States v. Nieves,* 609 F.2d 642, 645 (2d Cir. 1979), *cert. denied, 444 U.S. 1085 (1980)).  At the primary inspection area, the questioning of Defendant and the initial search of Defendant's vehicle by Officer Pelletier, who had observed that the name of Defendant's United States passport matched a name on the lookout sheet, as well as the initial pat-down by Officers Gray and McCarthy were thus part of a routine border search.

Officers Gray and McCarthy then escorted Defendant to the secondary inspection area while the existence of an outstanding arrest warrant for Defendant was confirmed.  At the secondary inspection area, Defendant was subjected to a second pat-down by Officer Gray.  It is settled, however, that "[t]he referral of a person entering

13

this country to a secondary inspector is part of the 'routine' border interrogation and

does not, in and of itself, focus on the person . . . . "  *United States v. Henry*, 604 F.2d

908, 920 (5th Cir. 1979).  Nor is the secondary inspection of a person custodial merely

because the person is subjected to a patdown search, *see United States v. Charleus,*

871 F.2d 265 (2d Cir. 1989) (light touching of back and lifting of shirt is "routine"); *United*

*States v. Grotke,* 702 F.2d 49 (2d Cir. 1983) (patdown and removal of shoes is routine

border search); *United States v. Nieves, supra* (removal and search of shoes is part of

routine border search), or is taken to a separate room away from the public area of the

Customs and Immigration building to complete declaration forms.  *See United States v.*

*Harrell,* 894 F.2d 120 (5th Cir.) (defendant interrogated in a room separated from the

public by glass enclosures), *cert. denied,* 498 U.S. 834 (1990); *United States v.*

*Bengivenga,* 845 F.2d 593  (5th Cir.) (*en banc*) (secondary inspection conducted in a

trailer a slight distance away from the checkpoint in order to spare the detainee public

embarrassment and to keep traffic moving), *cert. denied,* 488 U.S. 924 (1988).

        As such, in the instant case, the border agents were permitted to direct

Defendant to secondary inspection even in the absence of any probable cause or

reasonable suspicion that criminality was afoot.  Nor did the border agents need

probable cause or reasonable suspicion to further search Defendant's person and

property, including his vehicle and briefcase, once Defendant entered the secondary

inspection area.  Significantly, nothing in the record indicates that Defendant was asked

to make any incriminating statements respecting the Complaint while in either the

primary or secondary inspection area.

        Furthermore, insofar as Defendant challenges the search of his briefcase and the

14

seizure of documents contained therein following his arrest, it is well settled that a search incident to arrest does not violate the Fourth Amendment.  *Illinois v. Lafayette*, 462 U.S. 640, 645 (1983) (holding that under the "search incident to arrest" exception to the Fourth Amendment's warrant requirement, "[a] custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification.").  That the contents of Defendant's briefcase included records from various bank statements is of particular significance as possible evidence given that the arrest warrant commanded Defendant's arrest for conspiracy to commit mail fraud.  Thus, the arresting agents properly conducted a search incident to Defendant's arrest to seized and preserve potentially relevant evidence.  *See Knowles v. Iowa*, 525 U.S. 113, 116 (1998) (observing there are two historical rationales for the "search incident to arrest" exception to the warrant requirement, including "(1) the need to disarm the suspect in order to take him into custody, and (2) the need to preserve evidence for later use at trial.") (citing *United States v. Robinson*, 414 U.S. 218, 234 (1973)).

Nor has Defendant articulated a sufficient basis for a suppression hearing. Specifically, "[a]n evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992) (quoting *United States v. Licavoli*, 604 F.2d 613, 621 (9th Cir. 1979)) (further internal quotation marks omitted).  Defendant's papers are also devoid of any statement of Defendant suggesting the existence of a material issue of fact going to the merits of his claim sufficient to

require an evidentiary hearing.  *See United States v. Gillette*, 383 F.2d 843, 848 (2d Cir.

1967) (requiring an affidavit by someone alleging personal knowledge of relevant facts

sufficient to support request for evidentiary hearing) (citing *Cheng Wai v. United States*,

125 F.2d 915, 2d Cir. 1942)); *United States v. Florack*, 155 F.R.D. 49, 56 (W.D.N.Y.

1994) (observing the "required showing [for an evidentiary hearing] must be made by an

affidavit of someone with personal knowledge of the underlying facts").

There is thus no merit to Defendant's motion to suppress evidence on the basis

that the search to which he was subjected at the border was unlawful because it was

not based upon any probable cause or reasonable suspicion.  Defendant's motion to

suppress evidence seized at the border should be DENIED.


### C.    Defendant's Statements

Defendant seeks to suppress any statements, whether oral or written, made in

connection with the border stop and arrest and which the Government may seek to

introduce at trial on the basis that such statements were taken without regard to

Defendant's Fourth, Fifth and Sixth Amendment rights and that any admission was not

voluntary as required by 18 U.S.C. § 3501.  Marchese Affirmation ¶¶ 30-34.

Alternatively, Defendant requests a hearing to determine whether any such statements

were taken in violation of his constitutional rights.  *Id.* ¶ 35.

The Government argues in opposition that any statements Defendant made in

connection with the routine border inspection were not obtained in violation of

Defendant's Fourth, Fifth or Sixth Amendment rights.  Government's Response at 17-

18.  Upon determining that Defendant was the subject of a federal arrest warrant, the

CBP officers ceased questioning Defendant, and called FBI Agent Carden to the

Rainbow Bridge who, upon arriving at the Rainbow Bridge, read Defendant his *Miranda*

warning, following which Defendant gave no indication he wished to consult with an

attorney.  *Id*. at 18.  Moreover, the Government maintains that it is unaware of any

statements made by Defendant that are subject to suppression.  *Id*. at 18 & n. 2.

Defendant disputes neither fact by way of any affidavit based on personal knowledge

and an attorney's affidavit based on information and belief is insufficient.  *Florack*,

*supra*, at 56-57.

It is established law that warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436

(1966) (hereinafter "*Miranda*") are not required to be given to one, including a citizen,

detained at the border and subjected to a routine customs inquiry.  *United States v.

Silva,* 715 F. 2d 43, 46 (2d Cir. 1983) (citing *United States v. Moody*, 649 F. 2d 124, 127

(2d Cir. 1981)).

> Such routine detention and questioning is an inevitable burden commonly
> associated with border crossings and falls within the language of [*Miranda*],
> which excludes from the warning requirements established therein certain
> "general on-the-scene questioning as to facts surrounding a crime or other
> general questioning of citizens in the fact-finding process" because the
> "compelling atmosphere inherent" in custodial interrogation "is not necessarily
> present."

*Silva*, *supra*, at 46 (quoting *Miranda*, *supra*, at 477-48) (bracketed text added).

In *Silva*, *supra*, the court observed that the responses to routine border detention and

questioning elicited from the defendant "were necessary to determine the admission

status of [the defendant] and her effects."  *Silva*, *supra*, at 47.

Similarly, in the instant case, the routine questions put to Defendant at the

primary inspection area in connection with his attempt to enter the United States were

necessary to establish the admission status of Defendant and his effects.  Specifically,

Defendant was asked "where he was going; where he lived; how much currency he was

traveling with; if he was in possession of any cashier's checks, traveler's checks, or any

endorsed checks; and the contents of his briefcase."  Government's Response at 17.

Such detention and questioning, despite the presence of CBP officers, did not amount

to custodial interrogation requiring the giving of the *Miranda* warning.[9]

Nevertheless, *Miranda* warnings are required once "the questioning of the

officials becomes an interrogation that is custodial in nature in which information is

sought for the purpose of using it against [a] person in a criminal proceeding."  *United*

*States v. Henry*, 604 F.2d 908, 915 (5th Cir. 1979).  Absent an actual arrest, however,

"something must be said or done by the authorities, either in the manner of approach or

in the tone or extent of their questioning which indicates that they would not have

heeded a request to depart or to allow the suspect to do so."  *United States v. Hall*, 421

F. 2d 540, 545 (2d Cir. 1969), *cert. denied*, 397 U.S. 990 (1970).

In the instant case, however, when CBP Officers realized Defendant was the

subject of a federal arrest warrant, Agent Carden was summoned and read Defendant

his *Miranda* warnings and, according to the Government, Defendant made no further

statements until he contacted his attorney.  Government's Response at 18.  Defendant

does not dispute this version of the scenario.  In fact, nothing in the record indicates that

Defendant was subjected to further interrogation once the border agents discovered the

---

[9] While the amount of currency conceivably could be related to the instant charges, a fair reading of Agent Gray's statement points persuasively to the conclusion that the agent's questions related to whether Defendant was in possession of currency exceeding $ 10,000, which Defendant would have been obligated to report, and not to the fraud allegations in the Complaint.

outstanding federal arrest warrant which triggered the summoning of Agent Carden to the Rainbow Bridge.  Significantly, Defendant does not assert that he was ever questioned by either the border agents or Agent Carden regarding the circumstances underlying the federal arrest warrant.

Nor has Defendant articulated any basis requiring a hearing to determine whether any statements were obtained in violation of Defendant's constitutional rights. As discussed above, Discussion, *supra*, at 15, absent "sufficiently definite, specific, detailed, and nonconjectural" challenges to the validity of the search, the court is unable to conclude that "contested issues of fact going to the validity of the search are in question" requiring a hearing. *Pena*, *supra*, 339.  Rather, a hearing held absent the requisite showing would be nothing more than a "fishing expedition."

Defendant's motion should be DENIED insofar as it seeks to suppress statements made by Defendant in response to routine border questioning as well as to the alternative request for a suppression hearing.

## CONCLUSION

Based on the foregoing, Defendant's motion (Doc. No. 31) to suppress evidence or, alternatively, for a suppression hearing, should be DENIED.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      October 16, 2006
            Buffalo, New York

Pursuant to 28 U.S.C. §636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.</u>** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited*, 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Government and the Defendant.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      October 16, 2006
            Buffalo, New York